Filed 8/23/16  P. v. Castro CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JACOB CASTRO,<br><br>        Defendant and Appellant. | A138968<br><br>(Alameda County<br>Super. Ct. No. C168413A) |

A jury convicted defendant Jacob Castro of conspiracy to commit murder, and found true an allegation that he committed the offense for the benefit of, at the direction of, or in association with a criminal street gang.  The trial court sentenced Castro to 25 years to life in prison.  On appeal, Castro argues (1) there was insufficient evidence to support the conspiracy conviction or the gang enhancement, and (2) the court prejudicially erred by failing to instruct the jury sua sponte on withdrawal from conspiracy, lesser included offenses, and accomplice testimony.  We affirm.

## I.  BACKGROUND

### A.    Evidence at Trial

#### 1.    The Prosecution's Case

##### a.    The Viper Lounge Homicide

On August 30, 2008, a fistfight broke out between two groups of people at the Viper Lounge in Hayward.  Two Hispanic males fired gunshots, killing one person.  After reviewing surveillance videotape of the incident and interviewing witnesses, police arrested several people who they believed had been involved in the fight, including

1

Adelino Lopes. During a police interview after his arrest, Lopes identified the two shooters on the video as Rene Rebuelta and Ignacio Contreras. Rebuelta and Contreras were arrested and charged with murder. During discovery in Rebuelta's case, a police report that noted Lopes had identified Rebuelta and Contreras as the shooters was disclosed to defense counsel. On June 3, 2011, Rebuelta entered a plea of guilty to voluntary manslaughter. He was sentenced to 21 years in prison.

### b. The Plan to Kill Lopes

Gabriel Cota was a member of Norteños Most Deadly (NMD), a Norteño-affiliated gang. Castro, a distant cousin of Cota's, was a leader of NMD and was able to get Cota out of another gang and into NMD without being "jumped in." Cota knew Rebuelta and Lopes well. Rebuelta was a member of NMD; Lopes was a Norteño gang member.

Castro told Cota that Lopes had "snitched" on Rebuelta. Castro told Cota he wanted to kill Lopes. Cota also wanted to kill Lopes. Castro and Cota drove by Lopes's house many times, hoping to find him outside and kill him, but they never saw him.

In about April or May 2011, Cota wanted to get out of NMD. He had a good job and wanted to spend more time with his family. Cota spoke to Castro, who told him there was no getting out. Castro told Cota he would be killed if he wanted to get out.

Also in April or May 2011, Castro and Cota had a "sit-down" meeting in Castro's apartment. Castro said Cota had been showing weakness and that, to move up in the gang and gain respect, Cota and fellow NMD member Johnny Brown were going to kill Lopes. Castro explained that Cota would be the driver and would drop Brown off near Lopes's house. Brown would pose as a Comcast employee, go to Lopes's house, and kill Lopes and whoever else was there. Cota would wait nearby in the car for Brown, and they would drive away.

### c. Cota's Cooperation With the Police

Cota decided to go to the police and disclose the plan to kill Lopes. He felt he was being set up to fail, and he did not want to go to jail and be away from his family. Cota

did not care about Lopes being killed, but he did not want Lopes's wife or son to be killed.

On June 21, 2011, Cota went to the Hayward Police Department and asked to speak with someone in the gang suppression unit. He spoke with Detective Brian Maloney and Officer Padavana.

Later that day, Cota met with Castro, who gave him "paperwork" showing Lopes had "snitch[ed]" on Rebuelta, as well as a photograph of Lopes. Castro told Cota to burn the paperwork and the photograph. Castro also gave Cota a Comcast shirt to give to Brown. Cota later called Detective Maloney and told him about his meeting with Castro.

The following day, June 22, 2011, Cota met with the police again. He brought the paperwork (pages from police reports relating to the Viper Lounge homicide), the photograph and the Comcast shirt. Castro's fingerprints were on the paperwork.

Beginning on June 22, Detective Zachary Hoyer coordinated the investigation. Cota rode around with the police and pointed out the residences of Castro and other NMD members, as well as Lopes's house.

### d. The NMD Meeting at Castro's Residence

On June 25, 2011, Cota wore a concealed recording device to a meeting of NMD members at Castro's apartment. Those present included Castro, Cota, Brown, Lorenzo Farfan, Mike Rodriguez, Ruby Farfan, Francisco Chavez and two other NMD members. They met in Castro's bedroom. An audio recording of the meeting was played for the jury.

After Castro called the meeting to order, he asked how Cota and Brown felt. Brown responded that he was "cool with it," but "[w]e just need to sit down and plan it." Castro said, "That's what we're gonna do today." Castro said Brown and Cota needed to do their own reconnaissance and make sure they knew the route. Mike Rodriguez asked whether Brown had figured out his exit, and Brown stated he was leaving through the back.

Castro drew a map of the area around Lopes's house and showed where Cota would be waiting on the other side of the back fence, as well as the route to the freeway.

Castro asked Cota whether he had destroyed the items Castro had given him. Cota said he had burned them. Castro told Brown that he should avoid talking and should make it look like a home invasion robbery.

Brown said that he was going to have his gang tattoo removed, so the gang would not be implicated if he were caught, and that he was planning to go into hiding afterwards. Castro said he expected to be questioned by the police after the crime. Brown asked who was going to be the "middle person to go to, to let [Castro] know what went down." Castro replied that Francisco Chavez would do that.

Castro, Brown and Cota discussed when Brown and Cota should do the reconnaissance and carry out the crime. Castro stated the crime had to occur when he was at work. The meeting participants also discussed whether Brown should carry Comcast boxes, what he should wear, whether he should shave his mustache, and what type of weapon he should use. Castro suggested that Brown use a revolver so no shells would be left behind. Castro also suggested stabbing anyone who screamed in the neck, stating, "I don't give a fuck if it's his wife, his son, whatever. To me they're all pieces of shit anyways." Castro said he wanted it done soon, because Lopes had just gotten out of the hospital and knew there were people out to get him. Castro said, "I'm pretty sure while he's doing his twenty-one years, he'll feel a lot better knowing that motherfucker's dead."

When Castro asked if anyone had any advice, or anything to add, Mike Rodriguez said, "Obey the fuckin' speed limit." There was also a discussion of the license plates on the car Cota was to drive. Finally, Ruby Farfan, NMD's treasurer, led a discussion about the collection of dues and stressed that the gang had four people "locked up" who needed money.

After the meeting, police warned Lopes of the threat to his life. Lopes, who had just been released from the hospital and was bedridden, agreed to move from his residence.

4

### e. Pretext Calls and Reconnaissance

On June 29, 2011, Cota made pretext calls from the police station to several NMD members. Recordings of the conversations were played for the jury. Cota called Castro and discussed how to obtain license plates to use on the getaway car. Castro told Cota that he should get plates or have someone else in the gang do so. Castro stated that "Lorenzo's pretty good at shit like that." Cota also telephoned Brown to discuss their plans for conducting reconnaissance of the area around Lopes's house. Brown told Cota to give Ruby Farfan the address of Lopes's residence. When he did so, Ruby Farfan wrote the address down. Finally, Cota telephoned Lorenzo Farfan, who confirmed he would obtain license plates for Cota to use.

On July 1, 2011, Cota and Brown drove by Lopes's home and around the surrounding neighborhood to "scope[] out the area." Their conversation in Cota's car was recorded by the police, and the recording was played for the jury. During the drive, Cota and Brown discussed when they would kill Lopes, the weapon Brown was going to use, and whether he would have to shoot Lopes's wife and dog.

On July 5, 2011, Cota made additional pretext calls. Cota called Lorenzo Farfan, who confirmed he would be able to get the license plates for Cota soon. Cota also called Brown. Brown said that Castro had told Brown not to call him anymore. Brown said Castro and Lorenzo Farfan had told him that they trusted him enough to do it his way. Cota and Brown discussed the license plates and the date for the murder.

On July 6, 2011, Lopes died of natural causes.

### f. Arrests and Searches

Castro was arrested on July 8, 2011. He was wearing a red belt with the number 14 on the belt buckle. He was carrying a knife in his front left pants pocket. His key ring had a key that police later used to open a safe in his closet.

Police searched Castro's residence. In the safe in his closet, they found a pistol with a loaded magazine inside of it, money, a white piece of paper identified as an essay by Cota, yellow prison "kites" (a type of gang propaganda), a black mask or hood, and pay stubs in Castro's name from Save Mart. Cota testified Castro had required him to

5

write the essay about gang principles as a form of discipline. Cota also testified he had seen Castro put money, a gun, kites and the essay in the safe. Also in Castro's bedroom, police found a rifle, a bulletproof vest, two red bandanas, and a letter addressed to Castro with Rebuelta's return address. Above the bedroom door was a piece of art depicting a Huelga bird, which is used as a symbol by Norteño gangs.

Also on July 8, 2011, police arrested Brown, Ruby Farfan and Lorenzo Farfan. Police searched the residence shared by Brown, Ruby Farfan and Michael Rodriguez. They found a nine-millimeter Ruger semiautomatic handgun in Brown's bedroom closet. The gun was not loaded, but under the gun was a magazine loaded with 10 bullets, as well as one loose bullet. Also in Brown's room, police found a hat with "NMD" embroidered on it, and a piece of paper with Lopes's address written on it. In Ruby Farfan's bedroom, police found a binder with a list of names and amounts written on a notepad inside of it. There was also cash inside the binder. Also in Ruby Farfan's bedroom, police found a pad of paper with Lopes's address written on it.

Finally, on July 8, 2011, police searched Rene Rebuelta's jail cell. Police found redacted police reports, as well as correspondence and other documents. The pages of "paperwork" that Cota had obtained from Castro and given to the police corresponded to missing pages from the police reports in Rebuelta's cell. Police photographed Rebuelta's tattoos, which included "NMD" on his chest, "Death 14 Dishonor" on his arm, and "14" on his back.

### 2.     The Defense Case

Castro testified and denied entering a conspiracy to kill Lopes. Castro testified that his statement at the June 25, 2011 meeting about frequently driving by Lopes's house was an exaggeration. Castro admitted he had been involved in the "gang life" when he was younger.

Castro testified about a stabbing that occurred while he was in jail awaiting trial. Just prior to the stabbing, Castro and his cellmate were sitting next to the stabbing victim, who had testified against a Norteño gang member in a murder case. Castro denied that he and his cellmate took part in the attack.

**B.     The Charges, Verdict and Sentence**

A grand jury indictment charged Castro with conspiracy to commit murder (Pen. Code,[1] §§ 182, subd. (a)(1), 187, subd. (a)).  The indictment alleged Castro committed the offense for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)).  The jury convicted Castro of the conspiracy charge and found the gang allegation true.  The court sentenced Castro to 25 years to life in prison, with a requirement that he serve a minimum of 15 calendar years before becoming eligible for parole.  Castro appealed.

## II.  DISCUSSION

**A.     Sufficiency of the Evidence**

Castro argues there was insufficient evidence to support the conspiracy conviction or the gang enhancement.  In determining the sufficiency of the evidence to support a conviction or an enhancement, " ' "we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Wilson* (2008) 44 Cal.4th 758, 806.)  "We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. . . . 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

### 1.     Conspiracy

"The necessary elements of a criminal conspiracy are:  (1) an agreement between two or more persons; (2) with the specific intent to agree to commit a public offense; (3) with the further specific intent to commit that offense; and (4) an overt act committed by one or more of the parties for the purpose of accomplishing the object of the agreement or conspiracy." (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1128 (*Liu*).)

---

[1] All statutory references are to the Penal Code unless otherwise stated.

7

Castro argues that, since Cota was working with the police as of June 21, 2011, his "feigned" participation in the plot to kill Lopes cannot establish the agreement and intent elements of conspiracy. In cases involving only two persons, one of whom is a government agent or informer, the other cannot be convicted of conspiracy, "because the crime of conspiracy requires at least two people to have the requisite criminal specific intent, and a government agent by definition cannot be a coconspirator." (*Liu, supra,* 46 Cal.App.4th at p. 1128.) But as Castro acknowledges, this rule does not apply to conspiracies of more than two persons. As Division Three of this court explained in *Liu*, "the feigned participation of a false coconspirator or government agent in a conspiracy of more than two people does not negate criminal liability for conspiracy, as long as there are at least two other coconspirators who actually agree to the commission of the subject crime, specifically intend that the crime be committed, and themselves commit at least one overt act for the purpose of accomplishing the object of the conspiracy." (*Id.* at p. 1131.)

Applying this standard, there is sufficient evidence to support Castro's conspiracy conviction. The evidence supports a conclusion that multiple actual coconspirators—Castro, Brown and other NMD members—agreed to kill Lopes and intended that the crime be committed. Cota testified that Castro presented to him a plan in which Cota would be the driver and Brown would kill Lopes. The audio recording of the NMD meeting in Castro's bedroom supports the conclusion that Castro, Brown and others agreed and intended to kill Lopes. Castro suggests it is not clear from the recording what type of action against Lopes was being discussed, or whether anyone other than Brown and Cota agreed that such action should occur. But the jury reasonably could conclude that the participants in the meeting were discussing a plan to kill Lopes, and agreed and intended that the killing occur.

The meeting participants discussed when Brown and Cota should commit the crime, including the need for it to happen when Castro was at work so that, if Castro were questioned by the police, he could say he was at work when the crime occurred. The participants discussed the need for Brown and Cota to conduct reconnaissance, how

8

Brown should exit the house, where Cota should wait for Brown, the route they should drive when they left the scene, and the license plates to be used on the car Cota was to drive. They discussed whether Brown should carry Comcast boxes or other accessories, what he should wear, and what type of weapon he should use.

Castro suggests that, while the discussion on the recording may show the participants were willing "to participate in some form of action against Lopes" (such as an assault with a firearm), it does not show an agreement to murder him. But the evidence strongly supported the conclusion that the planned crime discussed on the recording was the murder of Lopes. Castro suggested in the meeting that Brown use a revolver because it would not leave shells, and stressed the importance of leaving behind "the least amount of evidence[.]" Castro explained: "The only thing is the fucking bullets that are in him, you know what I'm saying?" Castro then said using a knife would be even better. He stated: "Hopefully, like the way I told you, the way this is gonna work out, when you, when you pull out the pistol, you're not even gonna have to use it. What I want you to do, is stick this motherfucker. You're gonna get less heat on you from the cops, for one. They're gonna look into it a lot less than they will for a shooting. And on top of it, it isn't gonna bring as much noise to the area. First person that screams, stick him in the neck. You know what I'm saying?" Castro also stated: "I'm pretty sure while he's doing his twenty-one years, he'll feel a lot better knowing that motherfucker's *dead*." (Italics added.) The jury reasonably could conclude Castro intended that Lopes be killed because he had "snitched" on Rebuelta (who had been sentenced to 21 years in prison).

Finally, the recordings of Cota's pretext calls to NMD members provide additional evidence of the plan to kill Lopes, and the actions of NMD members in furtherance of that plan. On the pretext calls, Cota spoke with Castro, Lorenzo Farfan and Brown about obtaining license plates for the getaway car. Cota and Brown discussed the planned reconnaissance of the area around Lopes's house and when they should commit the crime. On one call, Ruby Farfan wrote down Lopes's address. Finally, as Cota and Brown drove around Lopes's neighborhood, they discussed when they would commit the

9

crime, the weapon Brown was going to use, and whether he would have to shoot Lopes's wife and dog.

## 2. The Gang Enhancement

Section 186.22, subdivision (b) imposes additional punishment on "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members[.]" A "criminal street gang" is any ongoing association of three or more persons that (1) has as one of its "primary activities" the commission of certain specified crimes; (2) has a common name or identifying symbol; and (3) engages through its members in a "pattern of criminal gang activity." (§ 186.22, subd. (f); *People v. Gardeley* (1996) 14 Cal.4th 605, 617, disapproved on another ground in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13.) Castro contends there was insufficient evidence that NMD's "primary activities" included the commission of statutorily enumerated crimes.

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. (See Webster's Internat. Dict. (2d ed. 1942) p. 1963 [defining "primary"].) That definition would necessarily exclude the occasional commission of those crimes by the group's members." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) Evidence of the past or present commission of enumerated crimes by group members is relevant in determining the group's primary activities, but is not necessarily sufficient on its own to establish the group's primary activities. (*Ibid.*) Evidence that a group's members consistently and repeatedly have committed enumerated crimes can establish the group's primary activities. (*Id.* at p. 324.) Expert opinion testimony on this point also may be sufficient. (*Ibid.*)

Substantial evidence supports a conclusion that NMD's primary activities included the commission of statutorily enumerated crimes. In addition to the charged conspiracy to commit murder, the prosecution presented evidence of three other enumerated crimes committed by NMD members: (1) NMD member Francisco Chavez possessed a loaded

10

firearm on April 1, 2007, and later was convicted of a misdemeanor violation of former section 12031 (now § 25850); (2) NMD member Rene Rebuelta shot and killed someone at the Viper Lounge on August 30, 2008, and later was convicted of voluntary manslaughter in violation of section 192; and (3) NMD member Raymond Clack robbed someone on May 13, 2010, and later was convicted of felony robbery in violation of section 211.  (See § 186.22, subd. (e)(2), (3), (33).)

In addition, Detective Zachary Hoyer, who testified as an expert on gangs, gang conduct and gang characteristics, opined that NMD's primary activities included the commission of conspiracy to commit murder, carrying loaded firearms, voluntary manslaughter and robbery.  Hoyer based his opinion on the prior arrests and convictions for such offenses by NMD gang members.  He also based his opinion on his discussions with Cota about NMD gang members and their activities.  Hoyer testified NMD had approximately 20 members and was a subset of the Norteños criminal street gang, which is associated with the color red and the number 14.  Hoyer's experience included working for three and one-half years in the Hayward Police Department's gang unit, where his primary duties included making contact with, and collecting information about, gang members.  He subsequently worked for two and one-half years as a detective in the department's gang investigations unit.  He participated in dozens of gang-related investigations, spoke with hundreds of gang members, and received training specific to gang activity.  Detective Hoyer's expert testimony, along with the evidence of specific crimes committed by NMD members, provided substantial evidence that NMD's primary activities included statutorily enumerated offenses.  (See *People v. Duran* (2002) 97 Cal.App.4th 1448, 1465 [testimony of gang expert may be sufficient to prove a group's primary activities].)

Castro contends the prior offenses by NMD members do not establish the "primary activities" element of the statutory definition of "criminal street gang," because the prosecution did not prove those offenses were committed for the benefit of a gang. We reject this argument.  When the prosecution introduces evidence of offenses committed by members of a group to establish that the group is a criminal street gang, the

11

prosecution need not prove those offenses were themselves gang-related. (See *People v. Gardeley, supra,* 14 Cal.4th at pp. 621–622 [predicate offenses used to establish "pattern of criminal gang activity" need not themselves be gang-related].)

The prosecution did have to prove the *charged offense* was committed *either* (a) for the benefit of, (b) at the direction of, *or* (c) in association with a criminal street gang. (§ 186.22, subd. (b); *In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1358.) The evidence supports two of these alternatives. First, there was substantial evidence Castro committed the offense "in association with" a criminal street gang within the meaning of section 186.22, as he conspired with Brown and other NMD members. (See *In re Daniel C., supra,* 195 Cal.App.4th at pp. 1358–1359.) Second, there was substantial evidence Castro committed the offense "for the benefit of" NMD. As outlined above, the evidence (including Cota's testimony and the recording of the NMD meeting) supported a conclusion that Castro wanted Lopes killed because he had "snitched" on NMD member Rebuelta. Detective Hoyer opined that, if a person were to "snitch" on a gang member, killing the "snitch" would benefit the gang. Detective Hoyer explained that acts of violence against informants or others who assist law enforcement have the effect of instilling fear in the community and deterring people from cooperating with law enforcement or providing information about crimes committed by gang members.

Castro argues Detective Hoyer's testimony on this point did not support a conclusion the charged crime was committed for the benefit of NMD because "retaliation against police informants is not restricted to gangs." But the section 186.22, subdivision (b) enhancement does not require that the charged crime benefit a criminal street gang in a way that is unique to such gangs. The fact that persons involved in other criminal enterprises or activities may also engage in violence against informants does not mean there is insufficient evidence that the planned killing of Lopes was for the benefit of NMD.

Castro also notes there is evidence NMD members wanted to conceal their involvement in the planned killing, such as Brown's reference to having his gang tattoo removed. But the jury reasonably could conclude that, even if the conspirators wanted to

12

avoid providing evidence that would allow police to tie the killing to NMD, the killing of Lopes nevertheless would benefit NMD by avenging Rebuelta and deterring future cooperation by others in the community.

Finally, Castro argues there was not a sufficient foundation for Detective Hoyer's testimony as to the primary activities of NMD. *In re Alexander L.* (2007) 149 Cal.App.4th 605, on which Castro relies, is distinguishable. In *In re Alexander L.*, a gang expert just stated he " 'kn[e]w' " members of the alleged gang had committed certain types of crimes, and the prosecutor elicited no testimony from the expert about the bases for his opinion. (*Id.* at pp. 611–612.) The appellate court concluded this testimony lacked an adequate foundation and did not provide sufficient evidence that the alleged gang's primary activities included the commission of enumerated crimes. (*Id.* at pp. 612– 614.) Here, in contrast, Detective Hoyer testified his opinion as to the primary activities of NMD was based on the arrests and convictions of named NMD members and on his conversations with former NMD member Cota. His testimony, together with the evidence of the charged conspiracy and the prior convictions of NMD members for enumerated offenses, constituted substantial evidence that the primary activities of NMD included the commission of enumerated offenses.[2]

## B.     Alleged Instructional Errors

Castro contends the trial court erred by failing to instruct the jury sua sponte on withdrawal from conspiracy, two lesser included offenses, and the need to view accomplice testimony with distrust. We find no prejudicial error.

### 1.     Withdrawal From Conspiracy

Castro argues the trial court should have instructed the jury sua sponte that he was not guilty of conspiracy if he withdrew from the conspiracy before any overt act was committed. (*People v. Crosby* (1962) 58 Cal.2d 713, 731.) We disagree.

---

[2] Castro does not contend on appeal that any portion of Detective Hoyer's testimony constituted inadmissible hearsay, so we do not address any such claim. (See *People v. Sanchez*, *supra*, 63 Cal.4th at pp. 670–671.)

"It is well settled that a defendant has a right to have the trial court . . . give a jury instruction on any affirmative defense for which the record contains substantial evidence [citation]—evidence sufficient for a reasonable jury to find in favor of the defendant [citation]—unless the defense is inconsistent with the defendant's theory of the case [citation]. In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' " (*People v. Salas* (2006) 37 Cal.4th 967, 982.)

" 'Generally, a defendant's mere failure to continue previously active participation in a conspiracy is not enough to constitute withdrawal.' " (*People v. Lowery* (1988) 200 Cal.App.3d 1207, 1220.) Instead, the defense of withdrawal from a conspiracy "requires 'an affirmative and bona fide rejection or repudiation of the conspiracy, communicated to the coconspirators.' " (*People v. Sconce* (1991) 228 Cal.App.3d 693, 701.)

No substantial evidence raised a reasonable doubt that Castro withdrew from the conspiracy. Castro points to the recording of a July 5, 2011 pretext call, in which Brown stated to Cota: "I guess [Castro] don't want me calling no more . . . ." Cota replied: "Yeah he told me not to call him either . . . ." These brief statements did not constitute substantial evidence that Castro affirmatively rejected or repudiated the conspiracy that he, Brown and others discussed at the June 25, 2011 meeting. To the contrary, Brown's understanding (expressed in the July 5 call) that Castro did not want Brown to call him was consistent with Castro's instructions to Brown at the June 25 meeting. At that meeting, Brown stated "[w]e just need to sit down and plan it," and Castro replied, "That's what we're gonna do today." Castro then instructed Brown: "Okay, you know the area, so within this week, you need to make time to take him [i.e., Cota] and do your own reconnaissance. *Do that shit by yourself. Me and you are not gonna have contact for a while . . . .*" (Italics added.) After Castro expressed the view that he would be suspected after the crime occurred, Brown asked who was going to be the "middle person to go to, to let [Castro] know what went down." After responding that Francisco Chavez would do that, Castro stated, "You're just gonna stay away from me, period." Castro also

14

emphasized the crime had to occur while he was at work, stating: "They try to say it was me, I was at work."

Castro's apparent statement (at some point after the June 25 meeting) that Brown and Cota should not contact him was consistent with the conspirators' original plan, and did not constitute substantial evidence that Castro affirmatively rejected or repudiated the conspiracy. Contrary to Castro's suggestion in his appellate briefs, there is no evidence that Castro told Brown or anyone else that he "no longer wanted anything to do with" the plan to kill Lopes.

In support of his appellate argument that a withdrawal instruction was required, Castro also cites his own testimony that he never intended or agreed to kill Lopes. That testimony does not support (and indeed is inconsistent with) a conclusion that Castro participated in, but then withdrew from, the conspiracy to kill Lopes.

Finally, in his reply brief, Castro points to Cota's testimony about Brown's statement on the July 5 pretext call that the crime was going to happen his way. This evidence does not assist Castro. On that call, Brown stated it was going to happen his way, and then stated that Castro and Lorenzo Farfan had told Brown that they trusted him enough to " 'do it [his] way.' " Brown's understanding (apparently based in part on a statement by Castro) that he had discretion as to how to carry out the crime does not constitute substantial evidence that Castro affirmatively rejected or repudiated the conspiracy.

### 2. Conspiracy To Commit Assault With A Firearm

Castro contends the court should have instructed the jury sua sponte on the offense of conspiracy to commit assault with a firearm as a lesser included offense of the charged conspiracy to commit murder. The Attorney General counters that conspiracy to commit assault with a firearm is not a lesser included offense of conspiracy to commit murder, and that the evidence did not support an instruction on the lesser offense in any event.

A trial court must instruct sua sponte on a lesser included offense if there is " ' "substantial evidence" [citation], " 'which, if accepted . . . , would absolve [the] defendant from guilt of the greater offense' [citation] but not the lesser." ' [Citation.]

15

Evidence is substantial if 'a reasonable jury could find [it] persuasive.' " (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.) When the defendant is charged with conspiracy to commit a specified target offense, "the trial court has a sua sponte obligation to instruct on lesser included target offenses if there is evidence from which the jury could find a conspiracy to commit a lesser offense." (*People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1706 (*Fenenbock*).)

A lesser offense is necessarily included in a greater offense if one of two tests— the " 'elements' test" and the " 'accusatory pleading' test"—is met. (*People v. Lopez* (1998) 19 Cal.4th 282, 288.) The elements test is satisfied if the greater offense cannot be committed without also committing the lesser offense. (*Ibid.*) "Under the accusatory pleading test, a lesser offense is included within the greater charged offense ' "if the charging allegations of the accusatory pleading include language describing the offense in such a way that if committed as specified the lesser offense is necessarily committed." ' " (*Id.* at pp. 288–289.)

A conspiracy to commit murder, like the crime of murder itself, does not require use of a firearm. Accordingly, under the elements test, conspiracy to commit assault with a firearm is not a lesser included offense of conspiracy to commit murder; the parties agree on this point. (See *People v. Cook* (2001) 91 Cal.App.4th 910, 918–919 (*Cook*).)

The parties also note there is a split of authority as to how the accusatory pleading test should be applied in conspiracy cases. In *Fenenbock*, Division One of this court held that, in determining whether a lesser offense is necessarily included in the offense that is alleged to be the target of the conspiracy, courts should consider only "the description of the agreement within the accusatory pleading, not the description of the overt acts[.]" (*Fenenbock, supra,* 46 Cal.App.4th at p. 1709.) The *Fenenbock* court reasoned that, in a conspiracy prosecution, "[i]t is the agreement, not the overt act in furtherance of the agreement, which constitutes the offense." (*Ibid.*) Because overt acts need not be criminal offenses and need not be committed by the defendant, "the description of the overt acts in the accusatory pleading does not provide notice of lesser offenses necessarily committed by the defendant." (*Ibid.*) Accordingly, where the information

16

alleged only that the defendants conspired to murder the victim, there was nothing to indicate an agreement with a lesser objective, and the trial court was not required to instruct sua sponte on conspiracy to commit assault, battery or mayhem. (*Ibid.*)

In *Cook*, the Third District disagreed with *Fenenbock*, and held that, in some circumstances, the overt acts alleged in an accusatory pleading can provide notice of lesser included offenses. (*Cook, supra,* 91 Cal.App.4th at pp. 920–921.) The information in *Cook* charged the defendants with conspiracy to commit murder, and alleged several overt acts, including (1) the defendants acquired a gun, and (2) one defendant shot the two victims, killing one and wounding another. (*Id.* at pp. 914–915, 919, fn. 22.) The trial court instructed the jury that conspiracy to commit assault with a firearm was a lesser included offense of conspiracy to commit murder, and the jury convicted the defendants of the lesser conspiracy charge (as well as convicting them of murder and other substantive offenses). (*Id.* at pp. 914–915.) On appeal, the defendants argued the trial court had erred in instructing on the lesser conspiracy offense. (*Id.* at p. 915.) The appellate court rejected this argument, holding the overt acts gave notice that the defendants were charged with conspiracy to commit murder by means of a firearm, an offense that cannot be committed without also committing assault with a firearm. (*Id.* at p. 920.) The appellate court held that, under the accusatory pleading test, the trial court had properly instructed the jury that conspiracy to commit assault with a firearm was a lesser included offense of conspiracy to commit murder. (*Ibid.*)

We need not decide whether *Fenenbock* or *Cook* states the better rule, because we find no error under either approach. First, the indictment alleges generally that Castro and others conspired to commit murder; nothing in this allegation suggests an agreement to commit a lesser crime. Accordingly, under *Fenenbock*, there was no basis for an instruction on a conspiracy to commit a lesser crime. (See *Fenenbock, supra,* 46 Cal.App.4th at p. 1709.)

Second, assuming the *Cook* approach should apply and the overt acts in the indictment may be considered, we find no error. Castro contends an instruction on conspiracy to commit assault with a firearm was warranted under *Cook*, because one of

17

the 11 overt acts alleged in the indictment is that, "[o]n or about July 8, 2011, [Brown] . . . possessed a 9 mm pistol and 9 mm ammunition." Even assuming that, under *Cook*, that overt act is sufficient to establish that conspiracy to commit assault with a firearm is a lesser included offense of the charged conspiracy to commit murder, we find no error. There was no substantial evidence that would absolve Castro of conspiracy to commit murder, but not conspiracy to commit assault with a firearm. (See *People v. Millbrook, supra,* 222 Cal.App.4th at p. 1137.)

If the jurors believed Castro participated in a conspiracy (a conclusion that, as discussed above, was amply supported by the evidence, including Cota's testimony, the audio recording of the June 25 meeting, and the recording of the pretext call to Castro), they could not reasonably conclude the object of that conspiracy was to assault Lopes with a firearm rather than to kill him. As noted, Castro's statements at the June 25 meeting strongly support the conclusion he wanted Lopes killed. Castro stressed it was important to leave behind as little evidence as possible, suggesting to that end that Brown use a revolver because it would not leave shells, and would just leave "the fucking bullets that are in him." Castro then suggested using a knife to "stick" Lopes (and his family if necessary), because that would trigger less police attention than a shooting. Finally, Castro, referring to Rebuelta's 21-year prison sentence, stated: "I'm pretty sure while he's doing his twenty-one years, he'll feel a lot better knowing that motherfucker's *dead*." (Italics added.)

In contrast to this ample evidence that the object of the conspiracy was murder, there was no evidence supporting a conclusion that the conspirators intended only to assault Lopes with a firearm (perhaps to frighten or wound him), but did not intend to kill him. Castro points to his own testimony about his statement during the June 25 meeting that "it" would have to happen when he was at work; Castro testified "it" changed and meant "a lot of different things," but "it" did not mean the murder of Lopes. Castro's assertion that "it" did not mean the killing of Lopes does not constitute substantial evidence that "it" referred to an alternative plan to assault Lopes with a firearm, or that such an assault was the object of the conspiracy.

18

### 3.     Solicitation to Commit Murder

Castro also contends the court should have instructed sua sponte on solicitation to commit murder (§ 653f, subd. (b)) as a lesser included offense of conspiracy to commit murder.  As noted, the trial court is required to instruct on a lesser included offense if substantial evidence exists that the defendant is guilty only of the lesser offense.  (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.)  But the court need not instruct on a lesser included offense if the evidence is such that the defendant, if guilty at all, was guilty of something beyond the lesser offense.  (*People v. Morrison* (1964) 228 Cal.App.2d 707, 713.)

The elements of solicitation are an offer or invitation to another to commit a crime and the intent that the crime be committed.  (*People v. Wilson* (2005) 36 Cal.4th 309, 328.)  The crime of solicitation is complete as soon as the verbal request is made with the requisite intent, and is punishable regardless of the agreement of the person solicited or any overt act.  (*Ibid.*)  Accordingly, intent that the crime of murder be committed is common to both solicitation of murder and conspiracy to murder.  In addition to this intent, the crime of conspiracy requires an agreement and some overt act in furtherance of the agreement.

Castro contends the jury could have concluded that he solicited the murder of Lopes by giving Cota a photograph of Lopes and a portion of a police report about Lopes (two of the overt acts alleged in the indictment), but that no one else agreed Lopes should be killed.  But the evidence showing Castro's intent that Lopes be murdered (an essential element of both solicitation and conspiracy) also showed an agreement that Lopes be murdered.  As discussed above, the recording of the June 25 meeting demonstrates Castro's plan was to kill Lopes.  And the recording reflects that the meeting participants agreed with that objective, as they discussed various aspects of the plan, including the need for Brown and Cota to conduct reconnaissance, how Brown should exit the house, where Cota should wait for Brown, the route they should drive to leave the scene, and the license plates they should use.  They discussed whether Brown should carry Comcast accessories, what he should wear, and what type of weapon he should use.  They

19

discussed when Brown and Cota should commit the crime, including the need for it to happen when Castro was at work. In light of this evidence establishing the agreement and overt acts elements of conspiracy,[3] Castro was guilty, if at all, of conspiracy to murder rather than solicitation of murder.

### 4. Accomplice Testimony

Castro argues the court should have instructed the jury to view Cota's testimony with caution or distrust because he was an accomplice. Section 1111 provides that a defendant cannot be convicted of a crime on the basis of an accomplice's testimony unless that testimony is corroborated by other evidence connecting the defendant with the offense. (§ 1111.) An accomplice is a person "who is liable to prosecution for the identical offense charged against the defendant on trial . . . ." (*Ibid.*) When there is sufficient evidence that a witness is an accomplice, the trial court has a sua sponte duty to instruct the jury on the principles governing the law of accomplices, including the need for corroboration (*People v. Tobias* (2001) 25 Cal.4th 327, 331), and the need to view with caution any accomplice testimony that tends to incriminate the defendant (*People v. Guiuan* (1998) 18 Cal.4th 558, 569).

Castro contends Cota was an accomplice (i.e., subject to prosecution for the charged conspiracy) based on his conduct before he went to the police. Even assuming this is correct, any error in failing to instruct on accomplice testimony was harmless. "A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is 'sufficient corroborating evidence in the record.' [Citation.] To corroborate the testimony of an accomplice, the prosecution must present 'independent evidence,' that is, evidence that 'tends to connect the defendant with the crime charged' without aid or assistance from the accomplice's testimony. [Citation.] Corroborating evidence is sufficient if it tends to implicate the defendant and thus relates to some act or fact that is an element of the crime. [Citations.] ' "[T]he corroborative evidence may be slight and

---

[3] Two of the overt acts alleged in the indictment were (1) Castro's assembling of the meeting and (2) the conspirators' attendance at the meeting.

entitled to little consideration when standing alone." ' " (*People v. Avila* (2006) 38 Cal.4th 491, 562–563.)

As discussed above, the audio recording of the June 25 meeting provides ample evidence that Castro intended and agreed that Lopes be killed. On appeal, Castro asserts that the recording of the meeting shows only that Brown and Cota were considering taking action against Lopes. This is incorrect. The recording reveals that Castro and the other participants in the meeting discussed numerous aspects of the plan to kill Lopes, including when the crime should occur, what Brown should wear and carry, the best escape route, and the weapon to be used. In addition, Castro stated Rebuelta would feel better knowing Lopes was dead. During the meeting, Castro referred to the "paperwork" (police reports) showing Lopes was a "snitch." Castro's fingerprints were on the paperwork. This evidence is sufficient to connect Castro to the charged conspiracy without the assistance of Cota's testimony.

## III. DISPOSITION

The judgment is affirmed.

21

_____
Streeter, J.

We concur:


_____
Ruvolo, P.J.


_____
Reardon, J.